UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN DOYLE,

Case No. No. 14-14277

Plaintiff,

District Judge Denise Page Hood

v.

Magistrate Judge R. Steven Whalen

COMMISSIONER OF
SOCIAL SECURITY,

Defendant.

_____ /

## REPORT AND RECOMMENDATION

Plaintiff Kevin Doyle ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act. The parties have filed cross-motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED [Docket #23] and that Plaintiff's Motion for Summary Judgment be DENIED [Docket #22].

## I.  PROCEDURAL HISTORY

On August 30, 2013, Plaintiff applied for DIB, alleging disability as of February 10, 2012 (Tr. 173). Plaintiff had filed an earlier claim which was denied on February 9, 2012 (Tr. 82-97). Upon initial denial of the claim, Plaintiff requested an administrative hearing, held

on June 17, 2014 in Flint, Michigan (Tr. 34).  Administrative Law Judge ("ALJ") Michael

R. Dunn presided.  Plaintiff, represented by Andrew Ferguson, testified (Tr. 38-59), as did

Vocational Expert ("VE") Stephanee Leach (Tr. 59-65).   On June 23, 2014, ALJ Dunn

determined that Plaintiff was not disabled (Tr. 18-29).  On September 8, 2014, the Appeals

Council denied review of the claim (Tr. 1-4).  Plaintiff filed suit in this Court on  November

6, 2014.

## II.  BACKGROUND FACTS

Plaintiff, born September 24, 1967, was 46 at the time of the administrative decision

(Tr. 29, 173).  He completed high school and worked previously as a welder (Tr. 196).  He

alleges disability as a result of depression and anxiety; shoulder, knee, and foot pain; and

bilateral Carpal Tunnel Syndrome ("CTS") (Tr. 195).

### A.  Plaintiff's Testimony

 Plaintiff offered the following testimony:

 He did not have a permanent address and was currently living in his car (Tr. 39).  He

held a valid driver's license and was able to drive short distances (Tr. 39).  He stood 6'1" and

weighed 260 pounds (Tr. 39).  He was right-handed (Tr. 39).  He was single and did not have

children (Tr. 39-40).  He served in the National Guard briefly in 1985 but was honorably

discharged after his knees "gave out" (Tr. 40).  He stopped working in 2010 because of

physical limitations due to repetitive movement and a shoulder and neck injury (Tr. 41).  He

settled a Worker's Compensation claim with his former employer (Tr. 41).

Plaintiff experienced five or six episodes of migraine headaches every day; back spasms; difficulty gripping; and knee numbness and pain (Tr. 42). His neck and shoulder pain was worse on the left (Tr. 43). He also experienced depression characterized by crying spells and problems focusing (Tr. 44). He avoided interacting with others (Tr. 44).

Plaintiff income was limited to food stamps (Tr. 44). He currently took Vicodin and Tramadol but was recently prescribed Neurontin and Trazodone as well (Tr. 46). The Vicodin and/or Tramadol caused the side effects of fatigue and a depressed mood (Tr. 46). Physical therapy for the shoulder worsened rather than improved the condition (Tr. 47). Steroid injections caused the side effect of migraines (Tr. 47). Plaintiff denied the current use of alcohol and illegal drugs (Tr. 48). He was unable to walk for more than two minutes, stand for ten, or sit for more than five (Tr. 48). He was unable to lift even one gallon of milk (Tr. 49).

In response to questioning by his attorney, Plaintiff rated his pain level as an "eight" to "ten" on a scale of one to ten (Tr. 50). Pain medication sometimes reduced his pain to a level "seven" (Tr. 50). Plaintiff took Tramadol for the migraines but experienced renewed pain after a couple of hours (Tr. 51). He had been living in his car for approximately six months (Tr. 51). He experienced nighttime sleep disturbances and required daily naps lasting between 45 and 120 minutes (Tr. 52). He needed to elevate his legs above waist level for approximately 80 percent of the day (Tr. 52-53). He was unable to perform any household chores (Tr. 54). In addition to gripping and lifting problems, Plaintiff experienced difficulty

bending and reaching (Tr. 54-55).  He avoided climbing stairs due to knee problems (Tr. 55).

He was also unable to kneel, crouch, or crawl (Tr. 56).

### B.  Medical Records

### 1.  Records Related to Plaintiff's Treatment[1]

January, 2012 records show that Plaintiff took Vicodin for the shoulder condition and

Zoloft for anxiety (Tr. 306).  In August, 2012, orthopedist Sidney N. Martin, M.D. noted

Plaintiff's report of left shoulder pain (Tr. 265).  Plaintiff reported that only Vicodin relieved

his pain (Tr. 265).  Plaintiff exhibited a normal affect and mood (Tr. 265).  Range of shoulder

motion was "minimally limited" (Tr. 265).  Dr. Martin noted a lack of muscle atrophy (Tr.

265).  A September, 2012 MRI of the left shoulder showed tendinosis with a large paralabral

cyst (Tr. 269-270, 272-273, 316-317).  The same month, an EMG showed mild median

neuropathy of the left wrist but no other abnormalities (Tr. 267).  Dr. Martin characterized

the results of the EMG as "stone cold normal" (Tr. 262, 327, 396).

In April, 2013, Plaintiff underwent left shoulder manipulation for the condition of

frozen shoulder (Tr. 276).  Following the manipulation, Dr. Martin prescribed one month of

physical therapy (Tr. 260, 325, 354).  Dr. Martin noted that shoulder was "not solidly frozen

(Tr. 260).  The following month, Plaintiff reported an exacerbation of left shoulder pain

while cleaning a fish (Tr. 259, 324, 393).  He also reported pain after performing yard work

---

[1]The Court has reviewed the medical records from 2012 forward.   The records post-dating the September 30, 2013 expiration of benefits are discussed to the extent they are pertinent to Plaintiff's condition for the relevant period.

(Tr. 258). In June, 2013, Plaintiff reported neck pain (Tr. 257). Plaintiff reported that "he might be 'addicted' to" his pain medication, but noted that he "'got back'" his range of shoulder motion after the manipulation (Tr. 257, 323, 391). Clinical testing was unremarkable (Tr. 257). An x-ray showed mild cervical spondylosis (Tr. 392). A July, 2013 MRI of the cervical spine showed mild stenosis at C5-C6 and mild sac effacement at C4-C5 (Tr. 274-275, 312, 383). The study was otherwise unremarkable (Tr. 275, 383). Matthew W. Hettle, M.D., noting that the MRI of the cervical spine showed "mild to moderate degenerative disc disease", recommended a surgical consultation (Tr. 254, 319, 387). Records from the following month state that Plaintiff took hydrocodone from neck pain (Tr. 280). In December, 2013, neurosurgeon Borhan Al-Atassi, M.D. found that Plaintiff was not a surgical candidate (Tr. 423-424, 427).

In January, 2014, treating source Alexander Rodriguez, M.D. noted the condition of arthralgia of the left shoulder and neck pain (Tr. 428). The same month, neurosurgeon Siva Sripada, D.O. noted Plaintiff's complaints of severe left-sided shoulder and neck pain (Tr. 398). Dr. Sripada recommended a series of cervical steroid injections (Tr. 398-399). In March, 2014, Plaintiff underwent two steroid injections (Tr. 401-402). The following month, Plaintiff reported minimal improvement from the injections (Tr. 405). Dr. Sripada noted that Plaintiff was "taking more hydrocodone" and was "complaining of some headaches occasionally . . ." (Tr. 405). Dr. Sripada found that Plaintiff was not a surgical candidate but recommended "left-sided cervical facet blocks" (Tr. 405). He declined to refill a prescription

for Valium (Tr. 405).   Later the same month, Dr. Sripada administered a facet block but refused to treat Plaintiff further after Plaintiff requested numerous refills of a hydrocodone prescription (Tr. 407).

In May, 2014, Plaintiff sought mental health treatment (Tr. 409).  Intake records state that Plaintiff was living in his car or at a friend's house and lived with his parents "off and on" (Tr. 410).  He reported depression, mood swings, and agitation (Tr. 411-412).  He was diagnosed with bipolar disorder with a GAF of 58[2] (Tr. 412).  The same month, Plaintiff stated that Zoloft did not help his psychological symptoms "at all" and that Vicodin did not relieve his pain (Tr. 415).  The following month, psychiatrist J.T. Aills, M.D. reported a diagnosis of bipolar disorder and that Plaintiff was currently taking Trazodone and Neurontin (Tr. 434).

## 2.  Other Records

In October, 2013 Karen Marshall, Psy.D. performed a psychological evaluation on behalf of the SSA, noting Plaintiff's report of "daily pain with limited mobility" (Tr. 333-336).  Plaintiff acknowledged long-term depression and inpatient treatment at the age of 23 after a suicide attempt (Tr. 333).  He characterized the anxiety as "something wrong happening," restlessness, and pacing (Tr. 333).  He reported taking Zoloft and Vicodin (Tr. 333).  He acknowledged the past abuse of illicit drugs and alcohol and four to five stints in

---

[2]

A GAF score of 51-60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders-- Text Revision* ("*DSM-IV-TR*"), 34 (4th ed. 2000).

drug rehabilitation (Tr. 333).  Plaintiff reported that he had been sober since 2009 (Tr. 334).

He reported that he got along well with his parents and visited a friend on the weekend (Tr.

334).  He reported that while he enjoyed "fishing, concerts, and being with friends," he was

limited by physical problems (Tr. 334).  He could perform chores "at a slower pace," but

experienced pain (Tr. 334).

Dr. Marshall found that Plaintiff did not "exaggerate or minimize" his symptoms and

had an appropriate affect with a depressed mood (Tr. 334).  She concluded that Plaintiff had

"no difficulty completing simple repetitive tasks" but socially, would expected to be

withdrawn (Tr. 335).  She found that Plaintiff's chronic pain "exacerbat[ed] his emotional

symptoms" (Tr. 336).

The same month, Asit D. Ray, M.D. performed a consultative examination on behalf

of the SSA, noting Plaintiff's report of bilateral plantar fasciitis, CTS, and neck and shoulder

problems (Tr. 339).  Dr. Ray noted that Plaintiff was independent in self care activities and

was able to drive himself to the appointment (Tr. 339).  Dr. Ray observed that Plaintiff could

walk normally without the use of a cane (Tr. 340).  He noted no atrophy of the shoulder or

upper back muscles (Tr. 340).  An examination of the the elbows, wrists, lumbar spine, and

hips was essentially normal (Tr. 341).  Plaintiff demonstrated "very poor" left grip strength

and some degree of medial arch tenderness (Tr. 341).  Plaintiff demonstrated "zero

movement in the neck" but did not wear a cervical collar (Tr. 342).  Dr. Ray found no

neurologic deficits (Tr. 342).  He concluded that Plaintiff "would be able to perform his usual

and customary activities including his occupational durties without any restrictions" (Tr. 342).

Later the same month, Elaine Pinaire, Ph.D. performed a non-examining assessment of Plaintiff's psychological condition on behalf of the SSA, finding that due to depression, anxiety, and substance addiction disorders, Plaintiff experienced mild restriction of activities of daily living and concentration, persistence or pace with moderate limitation in social functioning (Tr. 111).

### C. Vocational Testimony

VE Leach classified Plaintiff's past work as a welder as skilled at the heavy exertional level[3] (Tr. 59). The VE reported that the position had transferrable skills allowing for semiskilled, exertionally light work (Tr. 60). The ALJ then posed the following question to the VE, describing a hypothetical individual of Plaintiff's age, education, and work experience:

> [Assume a worker with the residual functional capacity to perform light work
> as defined in the regulations, except with restrictions of no repetitive pushing

---

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

or pulling in excess of 10 pounds; lifting a maximum of five pounds with the left upper extremity; no air or vibrating tools.... [L]imited contact with the public . . . meaning no more than occasional contact with the public. No prolonged walking or standing; and no above shoulder work with the upper extremity.[4] Now, withing those perimeters, could such a worker perform any of the claimant's past work as you have described it? (Tr. 43).

The VE found that the above limitations would preclude Plaintiff's past relevant work but would allow for the unskilled, exertionally light work of an assembler (1,000 positions in the regional economy); office clerk (2,000); and inspector (2,000) (Tr. 61).

The ALJ then posed a more restrictive set of hypothetical limitations:

[S]edentary exertional activities . . . lifting and carrying up to 10 pounds occasionally, less than that on a frequent basis. However, I want you to limit lifting and carrying to no more than five pounds independently with the left upper extremity. There should be no overhead reaching at all bilaterally. Our worker can occasionally climb ramps and stairs; should never climb ladders or scaffolds; can occasionally balance, stoop, crouch, kneel and no crawling. . . . [C]an frequently reach in all other directions with the left upper extremity, and can frequently handle and finger bilaterally, but there should be no repetitive forceful gripping or torquing with either upper extremity. The worker must avoid concentrated exposure to vibration; should have the opportunity to alternate between sitting and standing every 15 minutes; no interaction with the public ; and occasional interaction with supervisors and coworkers. Now, within those perimeters, would there be any jobs that exist in significant numbers that such a worker would be capable of performing? (Tr. 61-62).

In response, the VE testified that the amended restrictions would allow for the the unskilled work of an office clerk (sedentary) (1,000); surveillance system monitor (1,000); and packer (1,000) (Tr. 62). The VE testified further that if the individual were further limited to

---

[4]The hypothetical limitations are identical to those posed by the ALJ in the previous application for benefits (Tr. 78-79).

*occasional* handling, the sedentary office clerk positions would be reduced to 500, the surveillance system position would remain unchanged, and the packer position would be eliminated (Tr. 63). She testified that if the same individual were off task for 20 percent of the day due to medication side effects, pain, and concentrational problems, all work would be precluded (Tr. 63). She stated that her testimony was consistent with the *Dictionary of Occupational Titles* ("*DOT*") and her own professional experience (Tr. 63).

In response to questioning by Plaintiff's attorney, the VE testified that if the individual described in the final hypothetical question were limited to occasional fingering, the office clerk job numbers would be reduced to 250 but the surveillance system monitor positions would remain unchanged (Tr. 64).

### D.  The ALJ's Decision

Citing *Drummond v. CSS,* 126 F.3d 837 (6th Cir. 1997) and Acquiescence Ruling 98-4(6), ALJ Dunn found "no change" in Plaintiff's condition since the February 9, 2012 decision and accordingly, was bound by those findings (Tr. 23, 85-93). ALJ Dunn found that through the date last insured for DIB of September 30, 2013, Plaintiff experienced the severe impairments of "cervicalgia, arthralgia of the left shoulder, history of bilateral plantar fasciitis, affective disorder, anxiety disorder, and polysubstance abuse disorder" but that none of the conditions met or medically equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 21). The ALJ found that Plaintiff had mild restriction in activities of daily living and concentration, persistence, and pace and moderate difficulty in

social functioning (Tr. 21-22).  Consistent with the earlier findings, the ALJ determined that

Plaintiff could perform exertionally light work with the following additional limitations:

> [N]o repetitive pushing or pulling in excess of 10 pounds; lifting a maximum
> of 5 pounds with the left upper extremity; no air or vibrating tools; limited,
> meaning no more than occasional, contact with the public; no prolonged
> walking or standing; and no above the shoulder work with the left upper
> extremity (Tr. 22, 88).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the jobs of assembler,

office clerk, and inspector (Tr. 29).

In support of the finding that Plaintiff's condition had not worsened since February

9, 2012, the ALJ noted that Plaintiff "report[ed] the same levels of pain prior to and after the

previous . . . decision" (Tr. 27).  The ALJ observed that while Plaintiff alleged exacerbations

of pain after "going fishing and performing yard work," those activities would be precluded

by Plaintiff's professed level of limitation (Tr. 27).  The ALJ cited the medical records

showing "drug-seeking behavior," noting that the headaches and muscle aches were consistent

with opioid withdrawal (Tr. 27).

### III.    STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether

it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and*

*Human Services,* 757 F.2d 803, 804 (6th Cir.  1985).  Substantial evidence is more than a

scintilla but less than a preponderance.  It is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401,

91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)).   The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir.  1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight."  *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### IV.    FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has

the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

### A.  Plaintiff's Arguments

Plaintiff, proceeding *pro se,* notes that since the June 23, 2014 decision, a December, 2014 through May, 2015 work attempt was aborted after he experienced increasingly severe symptoms of CTS. *Docket #22,* 1.  He states that with help of counsel, he is currently attempting to convince Workers' Compensation to pay for carpal tunnel release surgery. *Id.* He disputes ALJ Dunn's finding that he was engaged in "drug-seeking behavior," noting that his new physician told him that his pain medication had been over-prescribed. *Id.* at 1-2.  He notes that he has since been prescribed Methodone with good results. *Id.* at 2.  Plaintiff faults ALJ Dunn for finding that the disability claim was undermined by his receipt of unemployment benefits, noting that although he attempted to procure work, his attempts were thwarted his physical restrictions. *Id.* at 2.

Plaintiff's claim that current symptoms of CTS prevent him from working does not support the current application for benefits.  As noted by the ALJ, Plaintiff's entitlement to DIB expired on September 30, 2013 (Tr. 20).   The EMG of the upper extremities taken during the period under consideration shows almost entirely unremarkable results (Tr. 267).

 The fact that Plaintiff experienced possibly disabling symptoms of CTS between December, 2014 and May, 2015 is irrelevant to the present claim.  *See Sizemore v. Sec'y of Health & Human Servs.,* 825 F.2d 709, 712 (6th Cir.1988)(where a claimant's condition has worsened since the administrative decision, the proper remedy is to initiate a new claim for benefits rather than seek a Sentence Six remand).  I note that while Plaintiff is no longer eligible for DIB, he is not precluded from applying for SSI, provided he can establish both disability and financial need for the new period.[5]  Plaintiff's remaining arguments are addressed below.

## B.  Social Security Acquiescence Ruling 98-4(6)

 ALJ Dunn correctly determined that he was bound by ALJ Ransom's February 9, 2012 determination (Tr. 18, 23).  ALJ Dunn performed his analysis pursuant to Acquiescence Ruling ("AR") 98-4(6)*,* which states that in the absence of new and material evidence postdating an earlier decision under the same Title, the latter fact finder *must* adopt the previous RFC. (emphasis added).  AR 98-4(6), codifying *Drummond v. Commissioner of Social Security,* 126 F.3d 837 (6th Cir. 1997) provides as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating

---

5.  In order to obtain DIB benefits, a claimant must show medical disability, along with wages or self-employment income for a certain number of "quarters" preceding the onset of disability. 42 U.S.C. § 423(c)(1)(B)(i-ii). To show entitlement to SSI, a claimant is not required to show contributing wages or self-employment income, but must establish financial need. 42 U.S.C. § 1382.  Plaintiff applied only for DIB benefits.

to such a finding or there has been a change in law, regulations, or rulings affecting the finding or method for arriving at the finding.

In order to be awarded benefits subsequent to the original finding of non-disability, a claimant "must demonstrate that her condition has so worsened . . . that she was unable to perform substantial gainful activity." *Priest v. Social Security Admin*, 3 Fed.Appx. 275, 276, 2001 WL 92121, *1 (6th Cir. January 26, 2001)(citing *Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230, 1232-33 (6th Cir.1993)).

On February 9, 2012, ALJ Ransom found that Plaintiff had an RFC for light work with the following additional limitations:

> [N]o repetitive pushing or pulling in excess of 10 pounds; lifting a maximum of 5 pounds with the left upper extremity; no air or vibrating tools; limited, meaning no more than occasional, contact with the public; no prolonged walking or standing; and no above the shoulder work with the left upper extremity (Tr. 88).

ALJ Dunn, adopting this RFC verbatim, found "no change" in Plaintiff's condition since February 9, 2012 (Tr. 22-23).  In support of his determination, ALJ Dunn cited Dr. Martin's August, 2012 observation that Plaintiff did not experience muscle weakness or atrophy (Tr. 24).  He noted that an EMG showed only mild median neuropathy of the left wrist (Tr. 24).  He noted that the April, 2013 manipulation for frozen shoulder was successful (Tr. 24).  While Plaintiff alleged severe neck and shoulder pain, the ALJ noted that the clinical and imaging studies did not support the professed degree of limitation (Tr. 24-25).  The ALJ observed that Plaintiff had been discharged by a treating source for drug seeking behavior (Tr. 26).  He gave significant weight to Dr. Marshall's finding that Plaintiff experienced some

degree of social withdrawal (Tr. 26). Because substantial evidence in the current record supports the February 9, 2012 RFC, ALJ Dunn did not err in adopting the previous findings.

My own review of the transcript supports ALJ Dunn's findings. Dr. Martin's August, 2012 notes state that Plaintiff's range of shoulder motion was "minimally limited" (Tr. 265). Dr. Martin characterized the results of EMG studies as "stone cold normal" (Tr. 262). The July, 2013 MRI of the cervical spine showing mild findings undermines Plaintiff's claim that he was unable to move his neck (Tr. 342). While Plaintiff testified in June, 2014 that he lived out of his car (Tr. 39), he reported to a mental health treater one month earlier that he alternated between living in his car, living at a friend's house, and living with his parents (Tr. 410).

Further, the ALJ did not err in finding that Plaintiff's receipt of unemployment benefits for a portion of the relevant period undermined the disability claim (Tr. 20). *See Workman v. Commissioner of Social Sec.,* 105 Fed.Appx. 794, 801, 2004 WL 1745782, *7 (6th Cir. June 29, 2004)(*citing Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983) (Claimant's collection unemployment benefits, requiring her to state that she is ready and able to work, while at the same time alleging disability, can be used in support of a non-disability finding). To be sure, before discounting a disability claim on the basis that that the claimant collected unemployment benefits, the ALJ must consider the entirety of circumstances surrounding the application for benefits. *Smith v. Astrue,* 2011 WL 3897752, *5 (E.D.Mich. July 6, 2011). However, because the "entirety of circumstances" in this case strongly

supports the finding that Plaintiff was capable of working, the ALJ did not err in noting that

the receipt of unemployment benefits further undermined the disability claim.   Likewise,

Plaintiff's denial of drug-seeking behavior and contention that the fault lay with physicians

who "over-prescribed" medication during the relevant period is flatly contradicted by Dr.

Sripada's discharge of Plaintiff on the basis that Plaintiff requested quantities of hydrocodone

well above therapeutic dosages (Tr. 407).

In closing, my recommendation to uphold the administrative decision should not be

interpreted to trivialize Plaintiff's personal or medical problems. Nonetheless, the ALJ's

decision, well within the "zone of choice" accorded the administrative fact-finder, should not

be disturbed by this Court.   *Mullen v. Bowen, supra,* 800 F.2d at 545.

## VI.   CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be

GRANTED [Docket #23] and that Plaintiff's Motion for Summary Judgment be DENIED

[Docket #22].

Any objections to this  Report and Recommendation must be filed  within 14 days of

service  of  a  copy  hereof  as  provided  for  in  28  U.S.C.  §636(b)(1)  and  E.D.  Mich.  LR

72.1(d)(2).   Failure to file specific objections constitutes a waiver of any further right of

appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v.

Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th

Cir.   1981).   Filing  of  objections  which  raise  some  issues  but  fail  to  raise  others  with

specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  May 9, 2016


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on May 9, 2016, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen